# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

## [Emergency Processing Requested]

Civil Action No. _____

GODFREY JOHNSON, P.C., a Colorado
Corporation, on behalf of itself and all
similarly situated businesses within the
jurisdiction of the Court

      Plaintiff,

v.

JOVITA CARRANZA, in her official
capacity as Administrator of the United
States Small Business Administration

      Defendant.

---

## EMERGENCY *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER PURSUANT TO FED. R. CIV. P. 65(B)(1)

---

Plaintiff Godfrey Johnson, P.C., on behalf of itself and all similarly situated businesses within the jurisdiction of the Court, hereby bring this Emergency *Ex Parte* Motion for a Temporary Restraining Order Pursuant to Fed. R. Civ. P. 65(B)(1) and this Court's D.C.COLO.LCivR 65.1, and thereafter a Preliminary Injunction under Fed R. Civ. P. 65(a) once notice has been provided to the Defendant.

Upon conferral with the Clerk of the Court, Plaintiff was told that it could not file this Motion without first filing a Complaint. Due to the extreme time constraints associated with this

Motion, Plaintiff respectfully requests that the Court accept this Motion as its Complaint at this stage of proceedings.[1]

# I.   INTRODUCTION

The People of the United States of America face perhaps the greatest immediate threat to their lives since the founding of the Republic. Severe Acute Respiratory Syndrome Coronavirus 2 ("SARS-CoV-2" or the "Virus") and the Coronavirus Disease 2019 ("COVID-19") that the Virus causes is rampaging through the Nation wreaking havoc, instilling fear, and causing desperation throughout the populace.[2]

In response to the crisis, the President declared "the ongoing COVID-19 pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, territories, and the District of Columbia" on 13 March 2020. *See* Small Business Administration ("SBA") Interim Final Rule RIN 3245-AH34 (Federal Register Docket No. SBA-2020-0015), (hereafter the "Final Rule" and attached hereto as Exhibit A). "[O]n March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act," (the "CARES Act" or the "Act"),[3] H.R. 748 "(P.L. 116-136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic." *Id.* at 3. "The CARES Act was enacted to provide immediate assistance to individuals, families, and businesses affected by the COVID-19 emergency. *Id.*

---

[1]   Due to the fact that this Motion had to be prepared overnight on essentially no notice and without the opportunity for supervisory review, and the significant importance of the substantive issues set forth herein, the undersigned requests that the Court extend leniency to any inadvertent non-compliances with its rules.

[2]   Rather than waste the time of ourselves and the Court trying to cite every single background fact set forth herein, we ask the Court to take judicial notice of those facts related to the COVID-19 crisis commonly known in the Court's jurisdiction as set forth herein.

[3]   The complete enrolled Act is attached hereto as Exhibit B for the Court's convenience.

Among the provisions contained in the CARES Act are provisions authorizing the SBA to temporarily guarantee loans under a new loan program titled the "Paycheck Protection Program," or "PPP." *Id.* at 4. "Loans guaranteed under the Paycheck Protection Program (PPP) will be 100 percent guaranteed by SBA, and the full principal amount of the loans may qualify for loan forgiveness." *Id.* The PPP application process officially opened at midnight on Friday 3 April 2020, though most (if not all) banks will only begin accepting applications sometime after business opens on Friday morning.

The amount of a PPP Loan is determined *entirely* by a borrower's average "payroll costs" from the prior year. Many businesses—including Plaintiff—engage independent contractors to perform services critical to their operations. Indeed, the payroll of many businesses (including several of Plaintiff's clients) consists mostly—or even entirely—of payments to independent contractors. Fortunately, the Act defines "payroll costs" to include "payments of any compensation with respect to employees . . . and . . . the sum of payments of any compensation to . . . a[n] . . . independent contractor. . . .." Act at 7. Accordingly, Plaintiff (and many other similarly situated businesses, including many of Plaintiff's clients) intended to submit its application for a PPP Loan first thing in the morning on 3 April 2020 with a payroll cost figure that included payments to employees *and/or* payments to independent contractors.

However, at 5:59 PM Eastern Time on Thursday 2 April—six hours and one minute before the PPP program officially opened at midnight—Defendant Administrator of the SBA issued the Final Rule which categorically *excludes* payments to independent contractors from the definition of "payroll costs," in direct contravention of the plain language of the statute and the unmistakable intent of Congress for the Act to support America's small businesses through the COVID-19 crisis by covering two months of their payroll costs without distinction between employee and

independent contractors. Instead, the Final Rule will result in immediate material financial harm to Plaintiff and many of its clients, and on a wider basis will have an immediate and likely catastrophic affect upon the ability of tens of thousands (or more) of America's small businesses to continue as going concerns due to their inability to operate without PPP Loan funds to pay for the independent contractors that perform services critical to their operations over the next two months.

Where the Executive Branch does not faithfully carry out the Legislature's commands, the Judiciary must balance the scales. Thus, this Court should not permit the Administrator, an unelected Executive Branch Officer, to promulgate a last minute regulation flatly contrary to the language and intent of the Act and thwarting a critical component of the largest aid package *in the history of the planet*, passed by the People's democratically elected representatives in Congress and signed by their democratically elected President to carry the American economy through the worst health crisis *in its history*, on literally the eve of its implementation. The Final Rule's exclusion of independent contractors from the definition of "payroll costs" cannot be law.

Therefore, Plaintiff respectfully moves the Court to consider this Motion under its emergency procedures, grant the same, and issue a Temporary Restraining Order[4] ("TRO") enjoining the Administrator from enforcing the provisions in the Final Rule that exclude payments to independent contractors from the definition of "payroll costs." The fate of many of America's small businesses—and quite possible its entire economy—hangs in the balance.

---

[4]   Pursuant to this Court's Local Rules, a proposed TRO is appended hereto for the Court's use as it sees fit.

## II.  BACKGROUND

### A.  THE COVID-19 PANDEMIC POSES A CLEAR AND PRESENT DANGER TO THE LIVES AND LIVELIHOOD OF THE AMERICAN PEOPLE

As of the filing of this Motion, the Virus has infected 245,573[5] people in the United States—and has killed at least 4,513 of them,[6] more than the immediate number of deaths from the September 11, 2001, terrorist attacks. The President's 'coronavirus task force" projected earlier this week that even with the mitigation efforts now in place—100,000 to 240,000 Americans will likely lose their lives to the Virus.[7] This is more than the total number of American's killed in combat during the Revolutionary War, the War of 1812, both Mexican-American Wars, the Spanish-American War, World War I, the Korean War, the Vietnam War, the Gulf War, and the War on Terror *combined*, and at the upper end of that range is approximately equal to the total combat deaths in the American Civil War (on both sides combined) or World War II.

But it is not just Americans' lives that are at stake, but their economic livelihood as well. The Virus has effected every single American in the workforce, with millions upon millions put out of work completely; while "many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State, and local public health measures that are being taken to minimize the public's exposure to the virus." Final Rule at 2–3. As of this date, the vast majority of the population is under virtual lockdown while a heroic cadre of their fellow Americans from doctors and nurses frantically fighting to save lives in hospitals—to farmers, truckers, and

---

[5]   "Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)," https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6 (as of the update on April 3, 2019 at 5:12 AM Mountain Time).

[6]   Centers for Disease Control and Prevention, "Coronavirus Disease 2019 (COVID-19): Cases & Latest Updates," https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (as of the update on April 2, 2020 at 2:00 PM Mountain Time).

[7]   Rick Noack, Meryl Kornfield, Derek Hawkins, Teo Armus, Adam Taylor and Marisa Iati, THE WASHINGTON POST, "White House task force projects 100,000 to 240,000 deaths in U.S., even with mitigation efforts," https://www.washingtonpost.com/world/2020/03/31/coronavirus-latest-news/ (Mar. 31, 2020).

store workers valiantly keeping food and medicine flowing to a populace effectively trapped in their own homes.

**B.  THE UNITED STATES GOVERNMENT ISSUES TARDY AND CONFLICTING GUIDANCE FOR PPP LOANS**

So pressing was the need for American businesses to receive PPP loans that the Secretary of the Treasury announced that applications for businesses could begin on Friday 3 April 2020—only a week after the President signed the Act into law. Yet the Small Business Administration, tasked with issuing regulations under the Act, failed to timely promulgate such rules. Instead, both potential PPP borrowers and lenders were left without regulatory guidance and initially forced to rely only on the text of the Act for assistance. Thus, many banks—fearful of being overrun by a 'reverse Black Tuesday' of desperate borrowers[8]—began issuing loan guidance and applications on their own out of sheer desperation and the need to have *something* in place before 3 April.[9]

On Tuesday 31 March 2020, the United States Treasury finally issued an "Information Sheet" for future borrowers under the PPP program, attached hereto as Exhibit E. The "Borrower Fact Sheet" announced a loan interest rate of 0.50%, *id.* at 3 and stated that "***All loan terms will be the same for everyone***," *id.* at 1 (emphasis in the original).

Finally, the SBA promulgated the needed regulations to the public at 7:59 PM Mountain Time (5:59 PM Eastern Time) [10] on Thursday 2 April 2020—less than six hours before PPP loans

---

[8]   *See, e.g.,* Ken Sweet and Ryan J. Foley, ABC News, "Bank expect deluge of desperate businesses seeking loans," https://abcnews.go.com/Business/wireStory/bank-expect-deluge-desperate-businesses-seeking-loans-69952076 (April 2, 2020).

[9]   *See, e.g.,* Ameris Bank webpage and application packet, https://www.amerisbank.com/Paycheck-Protection-Program, attached hereto as Exhibit D. Page 4 of the Exhibit is a calculator the bank included in the application to calculate "payroll costs," which includes ""Self-Employment Income (and Sub contractors)." In other words, the bank prepared and promulgated the application based on the Act, which the Administrator has now contradicted at the last second (and, as discussed herein, in contravention of the plain wording of the Act itself).

[10]  According to the metadata embedded within the PDF containing the Final Rule, as demonstrated by a screenshot of said metadata attached hereto as Exhibit C.

became available to the public at midnight on 3 April 2020, and after the most borrowers and lenders—and the SBA itself—had closed for the day.

The Final Rule states that "[l]enders must comply with the applicable lender obligations set forth in this interim final rule," Final Rule at 5, and went into effect *immediately* affecting *all* PPP loan applications. *Id.* at 1–2. The Final Rule also contradicts material portions of the earlier guidance like the Borrower Fact Sheet—for example by doubling the interest rate to 1.0%. It also categorically barred payments to *all* independent contractors from being considered either in the amount of a PPP Loan, or forgiveness of that loan—flatly contrary to the plain language of the Act.

Chaos ensued.[11]

This Court should grant the Motion, issue the TRO, and bring order to at least some part of this chaos by permitting borrowers and lenders to once again rely on the plain language of the Act upon which so many borrowers and lenders—including Plaintiff—have been relying until last night.

## III.  JUSTIFICATION FOR EMERGENCY *EX PARTE* PROCEDURES

Pursuant to Fed. R. Civ. P. 65(b), a temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if: (1) it clearly appears from specific facts shown by affidavit or by the verified complaint or by testimony that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing

---

[11] See Stephanie Ruhle, Ben Popken and Michael Cappetta, ABC NEWS, "Banks warn of 'utter chaos' in new small business lending program," https://www.nbcnews.com/business/business-news/banks-warn-utter-chaos-new-small-business-lending-program-n1175336 (April 2, 2020).

or on the record the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required.

Due to the late (and now early) hour and the corresponding inability of the undersigned to receive the notarization necessary to an affidavit (further complicated by the COVID-19 crisis), the undersigned requests that the Court accept the facts set forth herein as if they had been submitted by affidavit. As an officer of this Court, the undersigned is bound by rule and law to a duty of absolute candor towards this tribunal, and accordingly swears under penalty of such rule and law as well as perjury under the laws of the State of Colorado and of the United States, and under penalty of contempt under this Court's inherent powers, that immediate and irreparable injury, loss, or damage will result to Plaintiff before Defendant or her attorney can be heard in opposition, and further certifies to the Court that notice should not be required due to the inability to notify or serve Defendant before irreparable harm accrues to Plaintiff.

A. **PLAINTIFF AND ALL SIMILARLY SITUATED BUSINESSES WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT CONSIDER THE MOTION IMMEDIATELY**

1. **Plaintiff (and many other businesses—including several of Plaintiff's clients) rely on independent contractors to perform a significant part of its operations; consequently, excluding payments to independent contractors will cause it great financial harm.**

Due to the costs associated with employees (e.g. payroll taxes, unemployment), many small businesses rely on independent contractors to perform work critical to their operations. For example, Plaintiff engages independent contractors to manage its file systems on a near-daily basis without which it cannot practice law. The inability to obtain PPP Loan funding to pay for these critical services endangers its liquidity during the COVID-19 crisis—precisely the *opposite* of what Congress intended in passing the Act. As another example, one of the Plaintiff's clients operates professional martial arts bouts televised around the country but is entirely reliant on independent contractors for *every* aspect of its operations. Thus, it will be unable to obtain *any*

PPP Loan funding for its operations pursuant to the Final Rule because *all* of its non-owner payroll consists of payments to independent contractors. Another client calculated a PPP Loan based on the plain language of the Act and the application set forth by the relevant bank at $50,000 based on payments to employees and independent contractors—but the Administrator's rule will reduce that amount to only $7,500—not nearly enough to keep it solvent. Accordingly, Plaintiff and many of its clients (as well as small businesses throughout the country) will be greatly harmed if the Final Rule bars them from including payments to independent contractors as part (or all) of their "payroll costs."

> **2. Plaintiff (and other similarly situated businesses) will be irreparably harmed before the Court can consider the Motion under its regular procedures.**

The PPP Loans are "first-come, first-served." Final Rule at 13. Thus, Plaintiff will lose its place in the 'line' (risking funds running out) for the PPP Loans if it delays filing to seek an injunction under this Court's regular order, or files its loan application incorrectly (by including independent contractors contrary to the Final Rule) and have its application rejected. Similarly, because only one application and loan is permitted, Final Rule at 12–13, if Plaintiff files in accordance with the Final Rule by excluding independent contractors, the relief sought from this Court would be moot because Plaintiff could not file a new application to claim payments to independent contractors even if this Court agrees and enjoins the offending provisions of the Final Rule. Therefore, Plaintiff (and all similarly situated businesses) will suffer irreparable harm regardless of what action it takes to mitigate such harm (delaying filing, filing in accordance with the Act but in violation of the Final Rule, or filing in accordance with the Final Rule) absent immediate intervention by this Court under its emergency procedures.

**3. Plaintiff (and other similarly situated businesses) cannot adequately mitigate this harm because the SBA issued the Final Rule at the eleventh hour, leaving it without adequate time to implement any reasonable mitigation measures.**

The PPP is not the only loan program created by the Act. The Act also significantly expanded the Section 7(b) Economic Injury Disaster Loans ("EIDL"). EIDL loans are based primarily on *all* income and expenses (including the cost of independent contractors). However, the EIDL application has been open in its current form since Sunday 29 March, 2020. Accordingly, hundreds of thousands of applications have been made—likely far more than there is funding available to pay, and at the very least delaying application approval by weeks.. Thus, even if Plaintiff (and all similarly situated businesses) were to make an immediate application for EIDL loans, and even if those loans were granted, it could not adequately mitigate the harm caused by the Final Rule because EIDL loans have much less favorable terms (e.g. no forgiveness, interest rate of 3.75%—more than three times higher than the PPP Loans) than the PPP loans, and will take—at best—weeks longer than the PPP Loans to issue.

**4. Plaintiff is unable to confer with Defendant before the irreparable harm occurs.**

As noted above, the SBA issued the Final Rule after the close of business on Thursday 2 April 2020. PPP Loans, as governed by the Act and the Final Rule, became available at midnight on 3 April 2020 and Plaintiff is filing this Motion first thing Friday morning—before conferral is possible. Consequently, it is impractical for the undersigned to confer with counsel for the SBA prior to filing this Motion because counsel for the SBA will not be available until after Plaintiff needs to submit its loan application or risk applying too late to receive funding before it runs out or has its application excessively delayed.

**B. FAILURE TO ACT WILL LIKELY SIGNIFICANTLY AND IRREPARABLY DAMAGE THE ECONOMY OF THE UNITED STATES**

Many attorneys are infamous for their inability to recognize when the courts have more important things on their mind than the petty disputes of their officers. *See, e.g. Art Ask Agency v.*

*Various Scheduled Parties,* No. 20-CV-1666, 2020 WL 1427085, at *1 (N.D. Ill. Mar. 18, 2020) (unpublished) (denying emergency relief to plaintiff during the COVID-19 pandemic in a case involving "counterfeit unicorn drawings" because "The world is facing a real emergency. Plaintiff is not."). The undersigned doubts that this Court has any more patience for spurious claims of a need for emergency relief than Judge Seeger did with the claimed emergency over counterfeit unicorns. Counsel according does not make the statement contained in the heading immediately above lightly.

But it is impossible to deny that excluding a major (and for many the primary) payroll expense of a broad swath of small businesses and accordingly denying them some or all of the financial relief they have been expecting and relying upon will critically undermine the very foundation of the Act—providing swift and broad financial assistance to America's small businesses. Indeed, those businesses that use primarily independent contractors (such as construction and trades) and have been relying on the plain language of the Act to believe that those costs would be eligible under a PPP Loan will likely become insolvent *long* before they can obtain alternative funding (if such is even available) or relief from this Court under its regular order. The loss of so many small businesses, and the corresponding drain on the unemployment systems of every State, will cause serious—and quite possibly catastrophic—damage to the economy of the United States. The windows for the Court to act to prevent this economic carnage is narrow indeed.

## C. THIS COURT SHOULD ACCORDINGLY CONSIDER THE MOTION UNDER ITS EMERGENCY PROCEDURES

Time is of the essence. Defendants last-minute changing of the rules of the game—in direct contravention of the plain language of the Act *and* Congress' express intent in passing it—will, without swift intervention by this Court, likely cause an economic disaster for a large swath of

America's small businesses. It is the duty of this Court to see that the Executive Branch faithfully carries out Congress' commands. Where, as here, a Principal Officer of the United States undermines Congress's legislative power by promulgating regulations flatly contrary to a statute and the intent of Congress, the Court must intervene. Where, as here, substantial and irreparable harm is likely to occur absent *swift* intervention, the Court should act expeditiously. Accordingly, Plaintiff respectfully requests that the Court consider this Motion *ex parte* under its emergency procedures.

## IV.  JURISDICTION & VENUE

### A.  THE COURT HAS SUBJECT MATTER JURISDICTION

Defendant Jovita Carranza, in her capacity as the Administrator of the SBA, signed and promulgated the Final Rule. Final Rule at 31. The Final Rule constitutes a final agency action under the Administrative Procedure Act because it is, by its own terms, a final rule interpreting a Federal statute (the Act) and is not subject to challenge except before this Court. *See* 5 U.S.C. § 551 (defining "rule" and "agency action"); § 704 (agency action "for which there is no other adequate remedy in a court are subject to judicial review"). Accordingly, this Court has jurisdiction to review the Final Rule and, accordingly, over this Motion because it arises under the laws of the United States. *See* 28 U.S.C. § 1331.

### B.  THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANT AND VENUE IS PROPER IN THE DISTRICT OF COLORADO

Suits against government officers acting in their official capacities or under color of office or legal authority, and against government agencies or the United States, may be brought, in the judicial district in which the plaintiff resides (provided, as here, that no real property is involved). 28 U.S.C. § 1391(e).

This action is brought against the Defendant only in her official capacity. Plaintiff is a Colorado corporation. Accordingly, this Court has jurisdiction over the Defendant and venue is proper in the District of Colorado.

# V.   STANDING

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

## A.   PLAINTIFF HAS STANDING BECAUSE IT IS ADVERSELY AFFECTED BY THE FINAL RULE

Plaintiff is directly adversely affected by the Final Rule promulgated by the Administrator because it prevents Plaintiff from obtaining a financial benefit to which Plaintiff is entitled by statute (the Act).

## B.   PLAINTIFF ALSO HAS THIRD-PARTY STANDING

Under the highly unusual circumstances present here, this Court should also permit Plaintiff to represent both its own clients, and all other adversely affected businesses within the Court's jurisdiction under the doctrine of third-party standing.

### 1.   Plaintiff has third-party standing to bring claims on behalf of its clients.

Ordinarily, as a matter of jurisdiction, one may not claim standing in Federal Court to vindicate the rights of some third party. However, there are recognized exceptions to the general rule in cases where the party whose rights are being invoked is not in a position to assert those right effectively because, at times, "it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court." *Barrows v. Jackson*, 346 U.S. 249, 257 (1953).

Plaintiff's relevant small business clients have instructed it to file their applications for PPP Loans at the first possible opportunity today, but the Administrator's last-minute promulgation of

the Final Rule last night excluding payments to independent contractors from the definition of "payroll costs" significantly alters, and in some cases entirely eliminates, their eligibility for PPP Loans. Thus, unlike the political/social issues at issue in *Barrows* that limited access to the courts*,* here there is a literal bar to Plaintiff's clients bringing their own actions—their owners and/or officers are currently all sleeping and cannot authorize Plaintiff to bring suit on their behalf before this Motion must be filed in an attempt to avoid the damage from delay set forth above. Accordingly, this Court should permit—at least at this early stage of proceedings and under its emergency procedures—for Plaintiff to represent the interests of its affected clients.

### 2. Plaintiff also has third-party standing to bring claims on behalf of all similarly situated businesses within the court's jurisdiction

The same premise applies (albeit with lesser force due to the lack of an agency relationship) between Plaintiff and all similarly situated businesses within the jurisdiction of the Court. Most PPP-eligible business owners, and their attorneys, are likely unaware of the Administrator's Final Rule that was not promulgated until well after the close of business. Moreover, many will likely not become aware until they have already filed their PPP Loan applications because they already completed the applications yesterday (based on the plain wording of the Act) for submission this morning—and in an effort to get in the front of the 'first come, first served' line will file before becoming aware of the Final Rule. Moreover, by the time these businesses could bring their own claims before a court and receive relief, they will have suffered irreparable harm in their PPP applications for the reasons set forth above. Accordingly, many similarly situated businesses cannot, as a practical matter, bring their claims directly at this stage of proceedings—yet time is of the essence to receive relief.

Finally, this Motion calls for a straightforward interpretation of the Act and review of the Final Rule—neither of which require any factual analysis of any of the individual circumstances

of the businesses affected by the Final Rule. Accordingly, this Court should—under these *highly unusual circumstances*—permit Plaintiff to stand, at least at this stage of proceedings, for all similarly situated businesses within the jurisdiction of this Court.[12]

## VI.  DISCUSSION OF LAW ON THE MERITS OF THE MOTION

### A. THE ACT'S DEFINITION OF "PAYROLL COSTS" IS CLEAR; CONSEQUENTLY, IT IS NOT SUBJECT TO INTERPRETATION BY THE ADMINISTRATOR IN THE FIRST PLACE

When a court reviews an agency's construction of a statute which it administers, the court is confronted with two questions: whether Congress has directly spoken on precise question at issue; or, if statute is silent or ambiguous with respect to specific issue, whether the agency's answer is based on permissible construction of the statute. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984). Conversely, [i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.*

The Act plainly and unambiguously states that payments to independent contractors are included in the definition of "Payroll Costs":

> (viii) the term 'payroll costs—
>
> (I) means—
>
> > (aa) the sum of payments of any compensation with respect to employees that is a—
> >
> > > (AA) salary, wage, commission, or similar compensation;
> > >
> > > (BB) payment of cash tip or equivalent
> > >
> > > (CC) payment for vacation, parental, family, medical, or sick leave;
> > >
> > > (DD) allowance for dismissal or separation;

---

[12] Alternatively, the Court may consider Rule 23 class action certification a more proper mechanism to achieve the same end; to wit, uniformity in the application of a *vitally* important statute (the Act) with *very* little time to correct the Administrator's unreasonable interpretation of said Act.

(EE) payment required for the provisions of group health care benefits, including insurance premiums;

(FF) payment of any retirement benefit; or

(GG) payment of State or local tax assessed on the compensation of employees; **and**

(bb) **the sum of payments of any compensation to** or income of **a sole proprietor or independent contractor** that is a wage, commission, income, net earnings from self-employment**, or similar compensation** and that is in an amount that is not more than $100,000 in 1 year, as prorated for the covered period . . .

Act at 7 (emphasis added, internal quotation marks omitted).

The plain language of the statute is clear and unambiguous. The term "payroll costs" includes *both* wages a qualifying small business pays to employees, *and* compensation a qualifying small business pays to sole proprietors or independent contractors. Consequently, "the intent of Congress is clear," and "that is the end of the matter." *Chevron,* 467 U.S. at 843.

Beyond the clarity of the Act on this point from even the most cursory reading, Plaintiff draws the Court's attention to Congress' use of the word "and" between subparagraph (GG) and paragraph (bb) which establishes that payments to employees and payments to independent contractors are *both* part of "payroll costs" for the same business.[13] Thus, when read together with the preceding paragraphs (omitting the subparagraphs that further define allowable payments to employees, omitting ellipses, and generally cleaning up the citation to distill it to the essential parts), the entire definition reads as follows:

The term payroll costs means (aa) the sum of payments of any compensation with respect to employees and (bb) the sum of payments of any compensation to a sole proprietor or independent contractor.

---

[13] As opposed to the word "or" which could, in a vacuum, have lent support to the Administrator's interpretation in the Final Rule that (aa) and (bb) are meant to be read as separate provisions.

The statute is clear—payroll costs includes payments by a business to its employees *and* to its independent contractors.

Accordingly, the term "payroll costs" is not subject to interpretation by the Administrator or deference by this Court because there is nothing ambiguous to interpret. This Court should enjoin enforcement of the Final Rule's interpretation of the term on this ground alone.

1. **The Administrator's interpretation of "payroll costs" in the Final Rule is contrary to the plain language of the Act.**

The Final Rule states:

> Do independent contractors count as employees for purposes of PPP loan calculations?
>
> No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan calculation.

Final Rule at 11. It continues:

> Do independent contractors count as employees for purposes of PPP loan forgiveness?
>
> No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan forgiveness.

*Id.* at 15. Thus, an otherwise qualifying small business may not claim payroll costs for any payments to independent contractors.

Even if the term "payroll costs" was subject to interpretation, the Administrator's exclusion of payments to independent contractors flatly contradicts the plain wording of the Act which, as discussed above, includes payments to employees "and" payments to independent contractors.

Moreover, the Final Rule asks "Do independent contractors <u>count as employees</u> . . . ?" but then effectively answers a different question: 'do independent contractors <u>count in the borrower's PPP loan calculation</u> (and forgiveness calculation) at all?'. The plain language of the Act establishes that independent contractors do not count as "employees," but are still included in the "loan calculation" as part of "payroll costs" because that Act defines payroll costs to include *both*

employees and independent contractors. In other words, the Administrator answered a different question than she asked in both sections cited above, which results in an outcome (payments to dependent contractors are not included in "payroll costs") that is plainly contrary to the unambiguous language of the Act.

**B.   THE ADMINISTRATOR'S INTERPRETATION OF "PAYROLL COSTS" IS UNREASONABLE**

Federal administrative agencies are required to engage in "reasoned decisionmaking." *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (internal quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id*. It follows that agency action is lawful only if it rests "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983) (internal quotation marks omitted). *See also Michigan v. E.P.A.*, 135 S. Ct. 2699 (2015) (striking down EPA regulation where the regulation was not a reasonable interpretation of the governing statute).

**1.   The Administrator's interpretation of "payroll costs" is inconsistent with the plain language of other parts of the same section of the Act.**

An agency's construction of a silent or ambiguous statute is entitled to deference only if it is not in conflict with the plain language of the statute. *Nat'l R.R. Passenger Corp. v. Bos. & Maine Corp*., 503 U.S. 407, 417–18 (1992). Thus, even if the Act was silent or ambiguous on whether payments to independent contractors are included in the definition of "payroll costs," the Final Rule must not conflict with the plain language of the Act. Moreover, an agency's interpretation of one part of a statute must not render another part inapplicable or grant itself discretion where a statute explicitly limits it. *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 484 (2001).

The Act states:

> CONSIDERATIONS.—In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower—
>
> > (aa) was in operation on February 15, 2020 and
> >
> > (bb)
> >
> > > (AA) **had employees for whom the borrower paid salaries** and payroll taxes; **or**
> > >
> > > (BB) **paid independent contractors**, as reported on a Form 1099--MISC.

Act at 10 (emphasis added, internal quotation marks omitted). This paragraph thus establishes that the only considerations for eligibility of a business for a PPP Loan is 1) that the business was in operation on 15 February 2020); and, 2) that the business paid employees *or* paid independent contractors.

But this paragraph would make no sense under the Administrator's interpretation because the Final Rule excludes independent contractors from the definition of "payroll costs," which is the only factor for the *amount* of the loan. Thus, if payments *to* independent contractors do not count as "payroll costs" for the paying borrower, but only the *receipt* of those payments *by* the independent contractor borrower (for purposes of the independent contractor's own eligibility for a PPP Loan), then the fact that a borrower "**paid** independent contractors" would never be relevant to whether that business gets any loan *proceeds.* Consider that a business that paid no employees but only paid independent contractors would qualify under (BB) but the amount of its "payroll costs" (and, therefore, its PPP Loan) would be zero. This conclusion is reinforced by Congress' use of the word "or" between the two subparagraphs. That "or' plainly establishes that a business in operation on 15 February 2020 qualifies for a PPP Loan if it paid employees *or* paid independent contractors (or paid both). But consider that a business that paid employees *and* paid independent contractors qualify under (AA), and (BB) would then be superfluous. In other words, the Administrator's interpretation of "payroll costs' renders (BB) "utterly nugatory." *Whitman,* 531

U.S. at 484. This logically proves that the Administrator's interpretation conflicts with the plain language of the Act. To give effect to Subparagraph (BB), "payroll costs" must included payments to independent contractors. This Court should accordingly enjoin enforcement of the Final Rule's exclusion of payments to independent contractors from the definition of "payroll costs" to eliminate the conflict created by the Administrator's interpretation.

**2. The Administrator's interpretation inexorably leads to absurd results.**

"In the process of considering a regulation in relation to specific factual situations, a court may conclude the regulation is inconsistent with the statutory language or is an unreasonable implementation of it. In those instances, the regulation will not control." *United States v. Haggar Apparel Co.,* 526 U.S. 380, 392 (1999).

Under the Administrator's interpretation, an independent contractor qualifies for a PPP Loan based on the payments that independent contractor received over the previous twelve months. Simultaneously, the business that paid that independent contractor does not qualify for any PPP Loan proceeds (or forgiveness) for making those payments. This results in the following scenarios:

- Scenario 1: A particular business (Business A) cannot operate without the services of an independent contractor (Contractor W) but receives no PPP Loan proceeds to pay for those services due to the Final Rule. Business A cannot afford to hire Contractor W without the loan proceeds. Business A also cannot afford to hire an employee to perform the work performed because the business's "payroll costs" for the prior year did not include an extra employee performing the work, but only an independent contractor—which under the Administrator's interpretation does not count. Business A thus becomes insolvent and closes. Simultaneously, Contractor W is able to count the payments from Business A that it *received* over the prior year, but is under no obligation pursuant to the Act or the Final Rule to actually perform any work for Business A in exchange for those funds. Thus, while Business A goes under due to the lack of PPP Loan funds to pay for the work performed by Contractor A, Contractor W receives the same funds through a PPP Loan as Business A would have received, but without needing to perform any work for Business A or anyone else. This is an absurd result.

- Scenario 2: same facts as above but Business B *can* afford to pay Contractor X for its services. However, because Contractor X receives the same amount of money through a PPP Loan without the need to perform any work, it declines to perform the work for Business B and simply uses the PPP Loan proceeds to meet its revenue needs. This is an absurd result.

- Scenario 3: same facts as above, but Contractor Y agrees to perform the work for Business C. There is no provision in the Act or the Final Rule to offset the PPP Loan proceeds that Contractor Y receives against the payments it receives for doing the work for Business C. Thus, Contractor Y *doubles* its revenue over the two-month loan period—it gets 100% of the two-month average from the PPP Loan, and gets the *same* amount from Business C for performing the work at the contract rate. Thus, where a business is able to pay for an independent contractor even without the PPP Loan funds, and the independent contractor receives a PPP Loan (based on its prior work) but it is still willing to do the work for the contract rate, the Administrator's interpretation of "payroll costs" leads to the independent contractor *doubling* its money at the expense of the business that hired it. This is an absurd result.

- Scenario 4: Business D paid both employees and paid Contractor Z. Under the Final Rule, Business D receives a PPP Loan for the payments to its employees but for the amount it paid to Contractor Z. Business D cannot use its PPP Loan funds to pay Contractor Z for its services because it may only use the funds to pay payroll costs, rent, utilities, and interest on business mortgages—and the Administrator's interpretation of "payroll costs' excludes payments to independent contractors. Thus, even though Contractor Z provides critical personal services to Business D, Business D cannot use PPP Loan funds to pay for those services. This is an absurd result.

The absurd results of the scenarios above establish that the Administrator's interpretation of "payroll costs" is not reasonable.

If instead the plain wording of the Act were applied, each of the businesses in these examples would qualify for a PPP Loan and would have to spend those funds on "payroll costs," including paying any needed independent contractors for their services. An independent contractor that is made whole by such payments would probably not qualify for a PPP Loan in the first place (because it has not been negatively effected by the Virus under the terms of the Act). Thus, the business is able to pay its payroll (including its independent contractors) with PPP Loan funds

precisely as Congress intended and the Act directs, without the independent contractor doubling up or the business missing out. Thus, the Administrator's interpretation is unreasonable because it leads to absurd results.

### 3. The Administrator's interpretation is contrary to the express intent of Congress.

The Court should take judicial notice of the *unanimous* passage of the Act in the Senate and passage in the House by a vote of 419 to 6. This establishes that the objectives of the Act— the swift provision of Aid to America's small businesses—is *the* top priority of Congress.

Moreover, the stated reason for the Administrator's exclusion of payments to independent contractors is to avoid a scenario in which both the business *and* the independent contractor receive payment for the same expenditure. In other words, where the business claims the payment *to* the independent contractor as "payroll costs," and the independent contractor claims the payment *from* the business as "payroll costs" too. In a vacuum, this might appear to be a reasonable tack for the Administrator to take. However, as set forth above, it results in significant problems because the business receives no PPP Loan funding with which to pay for the needed work by the independent contractor, yet the independent contractor receives PPP Loan funds without having to do any work for it.

Moreover, Congress clearly established during debate on the Act that if given a choice between duplicating aid under the Act and ensuring speedy delivery of aid to *everyone* who needed it—Congress would choose the former and accept duplication for broader coverage. For example, the unemployment portion of the Act provides for a flat $600 per week in Federal unemployment on top of whatever an individual receives in state unemployment. This may result in a person receiving more from unemployment than that person received while employed. The undersigned's brother, a resident of the State of Washington, learned earlier this week that he would receive more in unemployment than he made at his primary job from which he has been temporarily furloughed

due to lack of work. In other words, the Federal aid duplicated a portion of the state aid. In an effort to close this loophole, Senator Sassee offered S.Amdt. 1577,[14] which would close the loophole,[15] but which could result in an individual receiving less per week than they had been previously making before losing their job because the amendment capped total unemployment (state Federal) per week at 100% of the individuals *average* wages, not what they had actually made just before losing their job. The Senate voted down the Amendment,[16] thereby establishing that under the Act Congress preferred duplicating aid over not fully aiding *anyone.* Therefore, the Administrator's interpretation of "payroll costs" is unreasonable because it would result in the *opposite* outcome—denying aid to many businesses in the name of avoiding duplicate aid to a few independent contractors.

## C. THE COURT SHOULD THEREFORE ENJOIN ENFORCEMENT OF THE ADMINISTRATOR'S INTERPRETATION OF "PAYROLL COSTS"

Defendant Administrator has interpreted a statutory provision that does not need interpreting in the first place (because it is clear and unambiguous on its face) and done so in a fashion that is contrary to the plain language of the statute itself. The Administrator's interpretation further leads to absurd results and is in all respects contrary to the express intent of Congress as demonstrated by its words and its actions. If permitted to stand, a large number of small businesses—including Plaintiff and a number of its clients—will be denied PPP Loan funding for legitimate payroll expenses for independent contractors necessary for these businesses to operate and authorized for payment by Congress. Moreover, a number of businesses—including several of Plaintiff's clients—that paid *only* independent contractors will be placed in the absurd position

---

[14] *See* https://www.congress.gov/amendment/116th-congress/senate-amendment/1577.

[15] *See* https://www.congress.gov/congressional-record/2020/03/25/senate-section/article/S2059-1.

[16] *See* https://www.congress.gov/amendment/116th-congress/senate-amendment/1577/actions.

of qualifying for a PPP Loan (because payments to independent contractors qualify for eligibility purposes), but receive zero dollars (because they have no "payroll costs" as the independent contractor payments do not count under the Administrator's interpretation). This cannot be law.

## VII.  GROUNDS FOR EQUITABLE RELIEF

### A.  EQUITABLE RELIEF IS JUSTIFIED

Injunctive relief is an extraordinary remedy that should be granted only when the moving party clearly and unequivocally demonstrates its necessity. *See Schrier v. Univ. of Colo.,* 427 F.3d 1253, 1258 (10th Cir. 2005). "'A preliminary injunction is an extraordinary remedy, the exception rather than the rule.'" *Free the Nipple–Fort Collins v. City of Fort Collins, Colo.,* 916 F.3d 792, 797 (10th Cir. 2019) (quotations omitted). "To succeed on a typical preliminary-injunction motion, the moving party needs to prove four things: (1) that she's 'substantially likely to succeed on the merits,' (2) that she'll 'suffer irreparable injury' if the court denies the injunction; (3) that her 'threatened injury' (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest.'" *Id.* (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC,* 562 F.3d 1067, 1070 (10th Cir. 2009)). The same elements apply to a TRO. *See Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir. 1980)) (noting that the four elements apply to both preliminary injunctions and temporary restraining orders and that "the same considerations apply" to both forms of injunctive relief). Plaintiff meets all four prongs of the test.

It is well established that "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004). Therefore, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered" *Id.* (quoting *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir. 1990)).

24

As set forth above in detail under our justification for the Court to use its emergency procedures rather than hear this Motion under its regular order, Plaintiff (and many other similarly situated businesses, including many of Plaintiff's clients) will suffer irreparable harm if the Court denies the request for a TRO due to the need to submit a proper PPP Loan application *immediately* (as in: today) or risk a lengthy delay in receiving a loan due to the number of people 'in line' ahead of it, risk having an application rejected, or risk submitting an application too late to receive anything.

Moreover, as also set forth above, Plaintiff is *substantially* likely to succeed on the merits given the volume of law weighing against Defendant's position. Next, the injury to the Plaintiff, its clients, other similarly situated businesses, and the National economy each *individually* outweigh the any injury to the Administrator—especially given that the Administrator *chose* to release the Final Rule after the close of business the night before the PPP Loans became available rather than earlier in the week, which could have allowed for more reasoned analysis and a less frantic response from Plaintiff. In short, the Administrator brought this upon herself. Finally, not only is the injunction not adverse to the public interest—it *supports* the public interest by ensuring that the will of the People's elected representatives in Congress is not overborne by an unelected bureaucrat acting at the last second and flatly contrary to the plain language of the law and the intent of the Congress. Accordingly, all factors weigh for granting the TRO, and ultimately for granting a preliminary injunction.

**B.  THE COURT SHOULD IMPOSE THE TRO NATIONWIDE**

If the Administrator had promulgated her interpretation of "payroll costs" under normal circumstances, it would be properly subject to challenge under the Court's regular order. But under the circumstances present here—promulgating regulations contrary to the governing Act with no notice, and a mere six hours before the PPP Loans were scheduled to begin while the Nation's

economy and the financial viability of its small businesses are on the edge of collapse—it is a recipe for economic disaster on a National (and perhaps even global) scale. Accordingly, this Court should issue a nationwide injunction enjoining the Administrator from enforcing the offending provisions of the Final Rule *anywhere*.

Injunctions that go beyond the parties to a case are rightly disfavored in Federal Court. However, a nationwide injunction is justified in this case because of the pressing need to achieve uniformity in the application of the Act's terms under *extreme* time pressure and the extraordinary circumstances of the COVID-19 pandemic where uniformity is key to a successful roll out of the PPP Loans. This cannot occur when, for example, a different branch of the same bank must apply different rules depending on whether that branch falls under a strictly local application of the requested TRO. Indeed, while a limited TRO would address Plaintiff's individual harms, it would likely make things *worse* for the wider economy by creating even more inconsistency and confusion on top of that already created by the last-minute promulgation of the Final Rule. Therefore, under the highly unusual circumstances here—and in particular the need to see Congress' intentions as codified in the Act implemented swiftly and decisively throughout the United States—this Court should enjoin the Administrator from enforcing the offending sections of the Final Rule *anywhere* in the Country.

## C.  REQUEST FOR EMERGENCY HEARING ON THE TRO

Plaintiff respectfully requests an emergency hearing at the first practical opportunity today Friday 3 April 2020 due to the need to receive a decision on this Motion at the earliest possible moment in order to have the Court's guidance before it submits its own loan application, and that of its affected clients. Plaintiff is happy to facilitate a videoconference or teleconference if most convenient to the Court given the disrupted operations of the courts during the pandemic, or is of

course at the Court's service for whatever method the Court directs for conducting such hearing if the Court sees fit to grant this request.

### D.  REQUEST FOR EXPEDITED HEARING ON A PRELIMINARY INJUNCTION

Due to the complications caused by the COVID-19 pandemic's effect on service of process combined with the importance of the merits and the need to ensure uniformity throughout the application process, Plaintiff respectfully requests that the Court forgo the ordinary preliminary injunction briefing process, waive the normal service requirements for the preliminary injunction, and permit Plaintiff to provide notice to the Administrator and the United States in any reasonable manner that permits verification, including the use of electronic mail, to reduce the time needed to provide proper notice.

## VIII. CONCLUSION

This Court knows all too well that attorneys are prone to hyperbole as they walk the fine line between zealous advocacy for their clients and unjustified puffery in which the smallest problem will inevitably become an Extinction Level Event absent a court's swift intervention. But the sheer magnitude of the damage that will be caused to the economy of the entire Nation by the Administrator's unlawful and almost incomprehensibly unreasonable action is (almost) beyond the capability of the undersigned to exaggerate.

The fate of the most powerful economy on this planet balances on the edge of a knife—and an unelected bureaucrat has decided to torpedo a central plank of Congress' plan to keep it from falling into the abyss for reasons that fail to survive even the most cursory scrutiny on the very night before it goes into effect.

Plaintiff, its clients, and tens of thousands of America's small businesses call for aid.

This Court should answer.

Respectfully submitted on this 3rd day of April 2020.

GODFREY | JOHNSON, P.C.

/s/ J. Kirk McGill
Joshua Kirk McGill, Esq.
9557 South Kingston Court
Englewood, Colorado 80112
Phone: (303) 228-0700
Fax:   (303) 228-0701
Email: mcgill@gojolaw.com